# CASES DETERMINED

IN THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1903.

---

THE STATE ex inf. CROW, Attorney-General, v. SHEPHERD.

*In Banc, October 13, 1903.*

1. **Contempt: POWER TO PUNISH.** The power of a court of record to punish for contempt is as old as the law itself.

2. **———: FREEDOM OF THE PRESS.** Freedom of the press means freedom to write and publish the truth; it does not mean freedom to write and publish falsehoods concerning public officials which impute to them corruption. An editor may write what he will so long as he tells the truth; but if he writes and publishes a falsehood he is liable for punishment just as are other men for *mala in se* or *mala prohibita.*

3. **———: FALSE WRITINGS.** To write and publish a falsehood concerning the court or its judges sitting in their judicial capacity, charging them of being corrupt and as having been bought to render a decision, is contempt of court.

4. **———: PUNISHMENT: TRIAL BY JURY.** Cases of contempt of court are not triable by a jury. The power to punish contempts summarily is inherent in all superior courts of record, and has been from time immemorial.

(205)

5. ——: ——: CONSTRUCTIVE CONTEMPTS. · Constructive contempts of court arise from matters not transpiring in court, and which tend to degrade or make impotent the authority of the court, or in some manner to impede or embarrass the administration of justice. The power of the court to punish for such contempts is the same as in direct contempts committed in the presence of the court.

6. ——: ——: DIFFERENCE BETWEEN DIRECT AND CONSTRUCTIVE CONTEMPTS. The difference between direct and constructive contempts is not one of power to punish, but only one of procedure. In direct contempts the court acts spontaneously, on its own motion, and commits the offender summarily; in constructive contempts, the court, upon information furnished by any citizen and verified by affidavit, or exhibited by the Attorney-General ex-officio, which needs no verification since it is supported by his official oath, or upon its own information or motion, issues a citation to the offender to show cause why he should not be punished.

7. ——: SCANDALIZING THE COURT. A contempt which consists of scandalizing the court itself is a matter where the State, the people and the court are vitally interested.

8. ——: ——: CAUSE PENDING. The injury to the public primarily in scandalizing the court itself is just as great whether it refers to a particular pending case, or only to the court as an instrumentality of government. And a constructive contempt of that character is none the less contemptuous because the case, to which the contemnor in his newspaper referred, has already been disposed of.

9. ——: CHARGING THE COURT WITH BRIBERY. A newspaper article charging the decision of the court, in a cause still pending, to be the result of corruption and bribery by one of the parties, is both civil and criminal contempt. It is criminal, because it scandalizes the court itself, and therefore it is a matter of public concern; it is civil, because it abuses parties to a cause still pending, and because it seeks to prejudice mankind against parties to such pending litigation.

10. ——: NOTICE OF CONTEMPT. The Supreme Court is the people's court, and if it did not take notice of a newspaper article which charges it to be corrupt and its decision in a certain cause to be the result of bribery, the people would have just cause to complain of its judges for not enforcing proper respect for this instrumentality established by them for the administration of justice.

11. ——: REGULATION BY STATUTE. The Legislature has no power to take away, abridge, impair, limit or regulate the power of courts of record to punish for contempt. And section 1616, Revised Statutes 1899, in so far as it attempts to do that, is unconstitutional.

State ex inf. v. Shepherd.

12. ———: ———: SEPARATE MAGISTRACY OF COURTS. The Constitution distributes the powers of government between the legislative, executive and judicial departments, and expressly provides that "no person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except in the instances in this Constitution expressly directed and permitted;" and the Constitution nowhere stating that the Legislature is given any power to enact any law regulating or limiting the inherent power of the courts to punish for contempts, the courts, being themselves creatures of the Constitution, can not be shorn, limited, abridged or regulated by the Legislature in the exercise of that inherent power. That was a power which the people conferred on the courts when by their Constitution they created the judicial department of the Government.

13. ———: BY WHAT COURT PUNISHABLE. The court in which a contempt is committed, or whose authority is defied, alone has power to punish it, or to entertain proceedings to that end. No other court has jurisdiction in such case.

14. ———: TRIAL BY JURY. To grant to the contemnor a trial by jury for scandalizing the court by charging in a newspaper that the judges were bought to render a certain opinion, would be illegal, and a shirking by the judges of their imperative duty under the law. If the scandalizing article refers to a decision of the Supreme Court, the law does not permit it to send the matter to another court to be tried, either by the judge, or a judge and jury.

15. ———: ———: CONSTITUTIONAL RIGHT. The right of trial by jury in contempt cases never existed at common law, and was wholly unknown in Missouri at the time of the adoption of the Constitutions of 1820, 1865, and 1875. Therefore the present Constitution in saying that "the right of trial by jury as heretofore enjoyed shall remain inviolate" did not guarantee to the contemnor a right to a jury trial, for that right had never been enjoyed before. It had theretofore been the universal law, both in America and England, that contempts were punishable by the court.

16. ———: ———: ISSUES OF FACTS. Where the contemnor, cited to appear and show cause why he should not be punished for contempt for charging that the judges of the Supreme Court had been bought to render a certain decision, by his written return admits that he wrote and published the charge in his newspaper, and offers nothing in mitigation of his conduct, and openly announces that he does not wish an opportunity to prove the truth of his charge, there is no fact in issue for the jury to pass upon, even if the law guaranteed him a jury in such case. After such return there are only questions of law to be decided.

*State ex inf. v. Shepherd.*

17. ———: DUE PROCESS OF LAW. One who has been regularly charged with contempt in an information filed by the Attorney-General, has been brought into court, has appeared in person and by counsel, has pleaded, and has had a trial according to the law of the land and the practices in such cases, has not been denied due process of law.

18. **Freedom of Press:** EXTRAORDINARY LIBERTY. Editors have no greater liberty of speech than any other citizen. Freedom of the press is not separately mentioned in the Missouri Constitution. The Constitution simply says "that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty." That means that newspapers and citizens have the same right to tell the truth about any body or any institution, and that neither has any right to scandalize any one or any institution. Nor does the Constitution of the United States confer any special freedom on the press that is not conferred on the citizen.

19. ———: ABOLITION OF CENSORSHIP. The constitutional provisions preventing the enactment of laws "abridging the freedom of the press" were meant to do away with censors and licensers. Since then editors have been privileged to write and publish whatever they please, but for an abuse of that liberty they may be punished. If they write only the truth, and do it in an orderly and decent way, they can not be punished. If they traduce their fellowmen or scandalize the courts by the publication of falsehoods, those constitutional provisions do not exempt them from punishment.

20. ———: INDULGENCE. Conductors of the public press have no peculiar rights or privileges or claims to indulgence. They have just the same rights that the rest of the community have, and no more.

21. ———: DEFAMATION AND CRITICISM. There is a wide difference between defamation and criticism. Every editor and every private citizen is entitled to pass an opinion on everything which in any way invites public attention. But wicked or corrupt motives should never be wantonly assigned to a court; unless there is some foundation in fact for such charges, they become, not criticism, but criminal contempt.

## Proceeding for Contempt on Information of Attorney-General.

RESPONDENT ADJUDGED GUILTY.

*Edward C. Crow*, Attorney-General, for informant.

*N. M. Bradley* and *Karnes, New & Krauthoff* for respondent.

MARSHALL, J.—This is an ex-officio information by the Attorney-General, informing the court that the defendant, as publisher of a certain weekly newspaper at Warrensburg, Missouri, called the Standard-Herald, on the 19th of June, 1903, published in said paper, the following article:

"When a citizen of Missouri stops long enough to think of the condition of affairs in his State, it is enough to chill his blood. A grand jury in Cole county has just found indictments against four members of the highest lawmaking body in the State, and the St. Louis grand jury has heard evidence within the past few months that, if it had the necessary jurisdiction, would have indicted many other members of the State Senate. The Missouri citizen has also seen the Cole county grand jury dissolved before the work mapped out for it was hardly begun, on the advice of the Attorney-General of the State. They also see the Chief Executive sitting passively at his office in the statehouse, not making a move to bring to justice the men who have been proven guilty of boodling in the Missouri Legislature by the St. Louis grand jury, but over whom the authorities of that city have no jurisdiction. And now, as the cap-sheaf of all this corruption in high places, the Supreme Court has at the whipcrack of the Missouri Pacific railroad, sold its soul to the corporations, and allowed Rube Oglesby to drag his wrecked frame through this life without even the pitiful remuneration of a few paltry dollars. Learned men of the law say that Rube Oglesby had the best damage suit against a corporation ever taken to the Supreme Court. This very tribunal, after reading the evidence, and hearing the arguments of the attorneys, rendered a decision sustaining the judgment of the lower court, which decision was concurred in by six of the seven members of the court. This is usually the end of such cases, and the decision of a Supreme Court, once made, usually stands. But not so in the

Vol 177 mo—14

Oglesby case. Three times was this case, at the request of the railway attorneys, opened for rehearing, and three times was the judgment of the lower court sustained. But during this time, which extended over a period of several years, the legal department of this great corporation was not the only department which was busy in circumventing the defeat of the Oglesby case. The political department was very, very busy. Each election has seen the hoisting of a railway attorney to the supreme bench, and when that body was to the satisfaction of the Missouri Pacific, the onslaught to kill the Oglesby case began. A motion for a rehearing was granted, and at the hearing of the case, it was reversed on an error in record of the trial court and was sent back for retrial. That was in the early part of the year 1902. The case was tried in Sedalia before Circuit Judge Longan, one of the ablest jurists in the State, and we have been informed that no error was allowed to creep into the record at the second trial. Again the jury rendered judgment in favor of Oglesby for $15,000, and again the case was appealed to the Supreme Court. An election was coming on, and the railroad needed yet another man to beat the Oglesby case. The Democratic nominating convention was kind, and furnished him in the person of Fox. The railroad, backed by four judges on the bench, allowed the case to come up for final hearing, and Monday the decision was handed down, reversed and not remanded for retrial. The victory of the railroad has been complete, and the corruption of the Supreme Court has been thorough. It has reversed and stultified itself in this case until no sane man can have any other opinion but that the judges who concurred in the opinion dismissing the Oglesby case have been bought in the interest of the railroad. What hope have the ordinary citizens of Missouri for justice and equitable laws in bodies where such open venality is practiced? and how long will they stand it? The corporations have long owned the Legislature,

now they own the Supreme Court, and the citizen who applies to either for justice against the corporation gets nothing. Rube Oglesby and his attorney, Mr. O. L. Houts, have made a strong fight for justice. They have not got it. The quivering limb that Rube left beneath the rotten freight car on Independence hill, and his blood that stained the right of way of the soulless corporation, have been buried beneath the wise legal verbiage of a venal court, and the wheels of the Juggernaut will continue to grind out men's lives, and a crooked court will continue to refuse them and their relatives damages, until the time comes when Missourians, irrespective of politics, rise up in their might and slay at the ballot box the corporation-bought lawmakers of the State.''

Upon the filing of said information, the court caused to be issued against the defendant, the following citation:

''Whereas, it is represented to our Supreme Court in Banc, by the information of Edward C. Crow, Attorney-General of the State of Missouri, ex-officio (a copy of which information is hereto attached), that you, the said J. M. Shepherd, publisher of a certain weekly newspaper at the city of Warrensburg, Missouri, called the Standard-Herald, did on the 19th day of June, 1903, while the case of H. R. Oglesby, respondent, against the Missouri Pacific Railway Company, appellant, was and still is pending in this court, publish a certain editorial and article then and there charging the Supreme Court of the State of Missouri, and the members thereof, with bribery and corruption, in connection with the action of the court in the disposition of said case; and that you, the said J. M. Shepherd, by said editorial and article aforesaid, published in the said Standard-Herald, did defame, degrade and insult the Supreme Court of the State of Missouri and the members thereof, and did charge the said court and its members with corruption and partiality in the discharge of their official duties,

and in the judicial official determination and disposition of said case of Oglesby vs. the Missouri Pacific Railway Company; and that said action in publishing said editorial and article, brings the Supreme Court and the members thereof and the highest department of the judicial branch of the State government, charged with the final disposition and enforcement of law and justice, into disrepute, contumely and contempt, and tends to destroy the power and influence of the court as an independent co-ordinate branch of the State government in the enforcement of the law and the administration of justice, and tends to and does causelessly inflame and incite the prejudices of the people against the said Supreme Court, and tends to and does affect the said court so as to directly obstruct and interfere with and impede the administration of justice in the above mentioned cause, and which said cause is now and here pending in said Supreme Court. Now, therefore, you, the said J. M. Shepherd, are hereby commanded to be and appear before the Honorable Supreme Court of Missouri, in banc, on Wednesday, July 22, 1903, at nine o'clock in the forenoon, at the Supreme Court house in the City of Jefferson, in the county of Cole, in the State of Missouri, then and there to show cause, if any you have, why an attachment should not issue against you for the contempt of this court, in publishing said editorial and article aforesaid, and hereof fail not.''

On the return day of the rule, the defendant filed the following return:

''In obedience to the command of this court heretofore made upon him, comes J. M. Shepherd, and for his return to the order to show cause heretofore issued herein, respectfully shows:

''1.    That this court has no jurisdiction to hear and determine the charges as contained in said complaint.

''2.    That said complaint and information does not state facts sufficient to authorize the issuance of an attachment for contempt of this court.

"3.   That it is true that on the 19th day of June, 1903, and long prior thereto, he was and is still the publisher and proprietor of a weekly newspaper published in the city of Warrensburg, State of Missouri, called the Standard-Herald, and that at said date he caused to be published in said newspaper the article set out in full in said complaint.

"4.   That he denies the other allegations set out in said complaint and information, and demands strict proof thereof.

"5.   Said article was not issued or circulated in the presence or hearing of the court, and was not intended to interfere, nor did it interfere, with any of the business of said court or any of its officers.

"6.   That nothing in said article referred to in said information tends to or does it affect the said court so as to obstruct or interfere with or impede the administration of justice by said court.

"7.   That at the time said article was published respondent believed the cause therein referred to had been finally disposed of by this court, and if said cause was still pending in this court, he had no knowledge of that fact.

"8.   Said complaint and information and the notice issued therein and all proceedings thereunder were and are in violation of section 14, article 2, of the Constitution of Missouri, which provision is specially invoked herein.

"9.   That said information and the proceedings thereunder as proposed deny to said Shepherd the right of a trial by jury of questions of which this court has no personal knowledge, all in violation of section 28, article 2 of the Constitution of Missouri, which is specially invoked herein.

"10.   That said complaint and the proceedings thereunder as proposed are in violation of section 30, article 2 of the Constitution of Missouri, which is specially invoked herein.

"11. That said complaint and information and the proceedings had and proposed thereunder are all in violation of section 1 of the fourteenth amendment to the Constitution of the United States, which is specially invoked herein, together with all the rights and privileges guaranteed thereunder.

"12. That section 1616 of the Revised Statutes of Missouri for 1899 provides: 'Every court of record shall have power to punish, as for a criminal contempt, persons guilty of any of the following acts, and no other: First, disorderly, contemptuous or insolent behavior, committed during its sitting, in immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority; second, any breach of the peace, noise or other disturbance, directly tending to interrupt its proceedings; third, willful disobedience of any process or order, lawfully issued or made by it; fourth, resistance willfully offered by any person to the lawful order or process of the court; fifth, the contumacious and unlawful refusal of any person to be sworn as a witness, or when so sworn, the like refusal to answer any legal and proper interrogatory.' And this respondent states that by virtue of said statute this court is not authorized to punish this respondent on account of any of the matters charged in the information herein.

"Wherefore he asks that this complaint be dismissed."

The matter coming on for hearing, the defendant appeared in person and by counsel. The Attorney-General, in open court, demanded of the defendant and his counsel to know whether or not they desired an opportunity to introduce evidence to show the truth of the matters charged in the article aforesaid, and announced the readiness of the State to proceed, at once, with the trial thereof. One of defendant's counsel, Mr. New, stated that as the return denied all the allegations of the information not specially admitted,

and demanded strict proof of the allegations of the information, his position was that the burden of proof was upon the informant to prove the falsity of the charges, and not upon the defendant to prove the truth of the charges. The other counsel for the defendant, Mr. Bradley, stated that, so far as he was concerned, he did not believe the charges were true, and that he did not desire an opportunity to introduce any evidence to show that they were true.

Thereupon, the hearing was proceeded with, the defendant standing upon the defenses set up in his return, with the additional point that the information was not verified. Upon final submission, the court adjudged the defendant guilty of contempt of court, and fixed his punishment at a fine of five hundred dollars and costs, the defendant to stand committed until the same was paid. Thereupon, the fine and costs were paid.

Ordinarily, this would close the case and the incident. But as this is the first case of this character that has ever arisen in this State or court, it was stated at the time of the rendition of the judgment, that a written opinion would be prepared and promulgated later, in order that the reasons upon which the judgment rested, and the law applicable to such cases, might be known and understood, to the end that well-disposed and good citizens might not innocently offend in such regard, and that all others guilty of like violations of law, should have notice of the consequences.

## I.

### THE CONTEMPT INVOLVED IN THIS CASE.

At the outset, it is proper to analyze the article in question, so as to clearly understand the character and scope of the charges. The article starts out with an attack upon the Attorney-General and the Governor of the State, in connection with offenses alleged to have been committed by members of the legislative branch

of the government. Then it alleges that, "as a cap-sheaf of all this corruption in high places" this court, "at the whipcrack of the Missouri Pacific railroad, sold its soul to the corporations." It then refers to the course, on former appeal, of the case of Oglesby against the Missouri Pacific railroad, in this court, and says: "Each election has seen the hoisting of a railroad attorney to the Supreme Bench." It then charges that the case was reversed and remanded for a new trial, and upon such new trial, the plaintiff again obtained a verdict, and an appeal was again taken; that the railroad needed another man to beat the case, and that the Democratic nominating convention furnished him, and that, "the railroad, backed by four judges on the bench, allowed the case to come up for final hearing," and that the judgment was reversed and the cause not remanded for retrial. The article then charges that "the victory of the railroad has been complete, and the corruption of the Supreme Court has been thorough. It has reversed and stultified itself in this case until no sane man can have any other opinion but that the judges who concurred in the opinion dismissing the Oglesby case have been bought in the interest of the railroad. What hope have the ordinary citizens of Missouri for justice and equitable laws in bodies where such open venality is practiced? And how long will they stand it? The corporations have long owned the Legislature, now they own the Supreme Court, and the citizen who applies to either for justice against the corporation gets nothing."

Thus it will be observed that this scandalous article makes the following charges: first, it charges the Attorney-General and the Governor with faithlessness in the discharge of their duties; second, it charges the legislative department with high and grave misdemeanors; third, it charges the Supreme Court with having "sold its soul to the corporations;" of being composed of railroad attorneys; of being guilty of corruption; of practicing open venality; of having been

"bought in the interest of the railroad;" and, like the Legislature, of being "owned" by the railroads; fourth, it charges the Democratic nominating convention of 1902, with having been dominated by the railroads, and with having nominated a candidate for Supreme Judge who would favor the railroad in the Oglesby case. In short, the article attacks the honesty, integrity and purity of every branch of the State government, and of the several officers, and then attacks the Democratic nominating convention of 1902.

If these charges are true, the persons who are thus charged should be prosecuted and removed from office. On the other hand, any one who makes such charges, should be prepared to make some sort of a decent showing of their truth.

Instead of standing ready to prove the truth of the charges, the defendant, when called into court, neither asserts the truth of the charges, nor does he accept the challenge of the Attorney-General to introduce any evidence whatever of their truth. On the contrary, one of his counsel takes the very erroneous position that the burden of proof is upon the informant to show the falsity of the charges, and not upon the defendant to prove the truth of the charges, while his other counsel expressly states that he does not believe the charges are true, and does not desire to introduce any evidence to show that they are true.

In other words, the defendant has grossly, indecently and cruelly villified and scandalized every department of the government under which he lives and which affords him protection for his life, liberty and property, and when challenged to make his words good, he consummates his offending by failing absolutely to produce one word of testimony to show that he told the truth, and instead of making the *"amende honorable,"* by withdrawing the charges and apologizing like a man, he seeks to escape punishment by challenging the jurisdiction of this court to protect itself from insult and to

maintain the respect and dignity with which the people have invested it, denies that the facts charged are sufficient to constitute a contempt, and raises other technical and constitutional questions.

As above stated, this is the first case of this kind that has come before this court. It is not, however, the first time that highly improper articles have been published concerning this court and other courts in this State, but it is the first case wherein the character and heinousness of the charges have made it absolutely imperative upon this court to take cognizance of them.

It is, by no means, however, the first case of its kind that has arisen. The books are full of cases, both English and American, where other courts have been similarly scandalized, and have punished the villifiers as for a contempt of court.

## II.

### INHERENT POWER OF COURTS OF RECORD TO PUNISH CONTEMPTS.

The first question raised by the defendant in this case is as to the power and jurisdiction of this court to punish him, summarily, for a criminal contempt.

The power to punish for contempt is as old as the law itself, and has been exercised so often that it would take a volume to refer to the cases. From the earliest dawn of civilization, the power has been conceded to exist. It has been exercised or not, as a matter of public policy, but its existence has never been denied. In England, it has been exercised when the contempt consisted of scandalizing the sovereign or his ministers, the lawmaking power, or the courts. In the American colonies, the same rule obtained and was exercised quite frequently. Since the Revolution, and the adoption of the Constitution of the United States, and the establishment of this government of the people, by the people and for the people, the English rule has been modified,

so far as the executive department and the ministers of State are concerned, and in some degree, so far as the legislative department is concerned, but has been almost universally preserved so far as the judicial department is concerned. For instance, in England, it was an offense, called sedition, to speak or write against the character and constitution of the government, or to seek to change it, by any means except those prescribed. There was also an offense known as *scandalum magnatum*, which consisted of scandalizing the sovereign, his ministers, members of Parliament, the courts and the judges, and certain other persons of high rank.

It is interesting to note the difference in policy with reference to the enforcement of the laws of other countries in respect to sedition and *scandalum magnatum.*

The first case of which there is a report at hand, was that wherein Emperor Augustus desired ''to punish a historian who passed some stinging jests on him and his family, but Maecenas advised him that the best policy was to let such things pass and be forgotten.'' Other sovereigns took the same view. ''Caesar said that to retaliate was only to contend with impudence and put one's self on the same level. And even Tiberius acted upon the same view. The Theodosian Code also made this the law, and expressly declared that slanderers of majesty should be unpunished, for if this proceeded from levity, it was to be despised; if from madness, it was to be pitied; and if from malice, it was to be forgiven; for all such sayings were to be regarded according to the weight they bore.'' [Paterson on Liberty of Press, Speech, etc., p. 87.]

But while such was the policy of these Latin countries, exactly the converse has long been the established law among English-speaking peoples. As early as the reign of Edward I. it was an offense to publish false news or tales, whereby discord might grow between the king and his people. [3 Edw. I, ch. 34.] Construing this act, Lord ELLENBOROUGH, C. J., said: ''If a person

who admits the wisdom and virtues of his Majesty, laments that in the exercise of these he has taken an unfortunate and erroneous view of the interests of his dominions, he was not prepared to say that this tends to degrade his Majesty or to alienate the affections of his subjects. He was not prepared to say this is libelous; but it must be with perfect decency and respect, and without any imputation of bad motives. If the writer were to go one step further and say or insinuate that his Majesty acts from any partial or corrupt view, or with an intention to favor or oppress any individual or class of men, then it must have been most libelous.''

In England, it is an offense to libel ministers of State. Holt, C. J., in Tutchin's case, 14 St. Tr. 1128, said that ''to assert that corrupt officers are appointed to administer affairs, is a reflection on the government, and tends to beget an ill opinion of the administration of the government.'' Criticisms which make no fair allowance to those public servants as being honestly desirous to do their work well, and imputing corruption or dishonesty, or any other personal vice incompatible with high sense of duty, are thus treated as libels.

In 1804, one Cobbett published a letter in which he spoke of Lord Hardwicke, lord lieutenant of Ireland, and Lord Redesdale, lord chancellor of Ireland, as ''a very eminent sheep-feeder from Cambridgeshire, assisted by a very able and strong-built chancery-pleader from Lincoln's Inn.'' He was prosecuted for libel, and Lord Ellenborough told the jury that ''if a publication be calculated to alienate the affections of the people, by bringing the government into disesteem, whether the expedient be by ridicule or obloquy, the person so conducting himself is exposed to the inflictions of the law. It is a crime.'' [Rex v. Cobbett, 29 St. Tr. 49.]

In 1786, the Morning Herald charged Pitt, the prime minister, with gambling in the funds and fraudulently availing himself of official information to make money on the Stock Exchange. He sued the publisher

for libel, and Lord MANSFIELD told the jury to remember this was "a very serious question, in which all the public were concerned, namely, whether there should be any protection to the reputation of honorable men in public or private life." The jury returned a verdict for £250. [Paterson on Liberty of the Press, etc., p. 95.]

The offense of *scandalum magnatum* has not existed in this country since the Revolution, but every one, of whatever rank or station in life, stands upon the same footing before the law, and is entitled to the same protection for his life, his liberty, his property and his reputation.

In the eye of our Constitutions and laws, every man is a sovereign, a ruler and a freeman, and has equal rights with every other man. We have no rank or station, except that of respectability and intelligence as opposed to indecency and ignorance, and the door to this rank stands open to every man to freely enter and abide therein, if he is qualified, and whether he is qualified or not depends upon the life and character and attainments and conduct of each person for himself. Every may may lawfully do what he will, so long as it is not *malum in se or malum prohibitum* or does not infringe upon the equally sacred rights of others. Every man may speak or write what he will, so long as he tells the truth, but no man has any more right to-day to bear false witness against his neighbor than he had in the days of Moses.

During the administration of the elder Adams, a sedition law was enacted, making it an offense to libel the Government, the Congress or the President of the United States, and four cases were prosecuted under it. But its constitutionality was always disputed by a large part of the citizens, and its impolicy was beyond question. It brought about the very conditions it was intended to repress, and was soon repealed. [Cooley's

Const. Lim. (6 Ed.), p. 526; Odgers on Libel and Slander, p. 416.]

The only offense of this general character which is known to our law is, attempts ''by word, deed or writing, to promote public disorder or to induce riot, rebellion or civil war, which acts are still considered seditions, and may, by overt acts, be treason.'' [Odgers on Libel and Slander, p. 419.]

The Parliament of England has, at least since as early as the reign of Richard II, claimed an inherent right to punish, summarily, as for a contempt, any breach of its privileges, and the books are full of cases wherein it exercised the power, as many as thirty cases occurring during the seventeenth century. The Parliament has always claimed and exercised the right to be the sole judge, without any interference or review by the courts, or otherwise, whether a contempt against its privileges has been committed, and how it shall be punished, and this power has been conceded to it. [Paterson on Liberty of Press, etc., p. 105 et seq.; Odgers on Libel and Slander, p. 422.]

So jealous and tenacious is Parliament of its rights in this regard, that in 1689 it actually cited two judges before it for contempt, for entering a judgment against the sergeant of the House, based upon his act in executing the orders of the House. And although the judges insisted that their act was only an error of judgment, they were adjudged guilty of contempt of the privileges of Parliament, and were committed to prison in Newgate, where they remained eight months. [Paterson's Liberty of the Press, etc., p. 201.]

The Congress of the United States and the legislatures of the several States have also an inherent power to punish for certain contempts, but this power is not generally admitted to be as broad as that of the Parliament of England.

The courts of England have uniformly, from the beginning, exercised the right to punish for contempt,

and the courts of America have always exercised a like power.

Blackstone, vol. 4, p. 285, in treating of such contempts, and the power of the court to punish therefor, says: "Some of these contempts may arise in the face of the court; as by rude and contumelious behavior; by obstinacy, perverseness or prevarication; by breach of the peace, or any willful disturbance whatever; others in the absence of the party; as by disobeying or treating with disrespect the king's writ, or the rules or process of the court; by perverting such writ or process to the purposes of private malice, extortion, or injustice; *by speaking or writing contemptuously of the court or judges, acting in their judicial capacity*" [the italics are superadded for the sake of emphasis]; "by printing false accounts (or even true ones without proper permission), of causes then depending in judgment; and by anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people."

Speaking to this subject, Paterson on Liberty of the Press, etc., p. 121, aptly says: "Courts of law must, therefore, as in the case of Parliament, be credited with sufficient power to vindicate and protect their procedure against attacks, for as courts are the appointed means of adjudicating on all disputes, and for discovering all sufficient materials to that end, their labors would be often futile, if irresponsible volunteers intruded crude opinions and speculations, founded, as they must usually be, on defective data. The first requisite of a court of justice is that its machinery be left undisturbed; and this can not be effected unless comments be all but excluded till the court has discharged its function. The same power to commit summarily for contempt all persons who intrude into the judicial function, and profess to have better and superior means of knowledge, or

who suggest partial or corrupt conduct, is thus deemed inherent in all courts of record, though the occasion and extent of this summary jurisdiction have given rise to nice distinctions. It is said to be a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt acted in the face of it. This exercise of power is as ancient as any other part of the common law. If the course of justice is obstructed, that obstruction must be violently removed. When men's allegiance to the laws is fundamentally shaken, this is a dangerous obstruction. That the judges should be credited with impartiality is absolutely necessary. Therefore, to libel or slander the administration of the law by imputing misconduct to the judge or jury is an indictable offense. Judges are also protected in other ways. To kill a judge in the performance of his duties is no less than high treason. Coke says that to draw a weapon at a judge sitting in court was a great misprision, for which the right hand was cut off and the goods were forfeited. To utter threats or reproaches to a judge, sitting in court, is always an indictable misdemeanor."

Rapalje on Contempts starts his work in section 1, with these statements: "It is conclusively settled by a long line of decisions that at common law, all courts of record have an inherent power to punish contempts committed *in facie curiae,* such power being essential to the very existence of a court as such, and granted as a necessary incident in establishing a tribunal as a court. . . . Each 'superior court' being the judge of its own power to punish contemnors, no other court can question the existence of that power, and the facts constituting the contempt need not be set out in the record. This inherent and necessary power can be exercised by a 'superior court,' independently of statutory authority, and such court may go beyond the powers given by statute, in order to preserve and enforce its constitutional powers, when acts in contempt invade

them.  Indeed, the conferment of the power by statute upon a superior court of record, is deemed no more than declaratory of the common law.''

In the note to the text, the author has collated decisions establishing this to be the law in Alabama, Arkansas, California, Connecticut, Florida, Indiana, Illinois, Kansas, Kentucky, Massachusetts, Maine, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, West Virginia, and in the United States Courts, as well as in England.

In 7 Am. and Eng. Ency. of Law (2 Ed.), p. 30, the rule of law is thus stated: ''The right of every superior court of record to punish for contempt of its authority or process is inherent from the very nature of its organization, and essential to its existence and protection and to the due administration of justice.'' And in the note to the text, the writer sets out a multitude of cases from the States and jurisdictions referred to by Rapalje, and shows that such is also the law in Colorado, Georgia, Michigan, Nebraska, Ohio, Oklahoma, South Dakota, Vermont and Virginia.

Judge Cooley in his work on Constitutional Limitations (6 Ed.), p. 389, note 2, says: ''Cases of contempt were never triable by jury; and the object of the power would be defeated in many cases if they were. The power to punish contempts summarily is incident to courts of record.'' In support of the law as thus stated, the learned author cites cases from England, the United States Courts, Maine, New York, Tennessee, Illinois, Arkansas, Kentucky, North Carolina, Mississippi, New Hampshire, Connecticut, Indiana and Rhode Island.

Best, J., in Rex v. Davison, 4 Barn. & Ald. l. c. 340, decided in 1821, said: ''From the earliest period of our history, this authority has been exercised.  The yearbooks record instances of such commitments.''  All

Vol 177 mo—15

the judges in Miller v. Knox, 4 Bing. N. C. 574, said it is "an acknowledged principle that the power of summarily punishing for contempt has been inherent in all courts of record from time immemorial."

In fact, so well settled is the law in England in this regard, that it is said in 3 Ency. of the Laws of England, page 313: "A court of justice, without power to vindicate its own dignity, to enforce obedience to its mandates, to protect its officers, to shield those who are entrusted to its care, would be an anomaly which could not be permitted to exist in any civilized community. . . . Without such protection, courts of justice would soon lose their hold upon public respect, and the maintenance of law and order would be rendered impossible."

Blackstone declares that: "Laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power therefore in the supreme courts of justice to suppress such contempts, by an immediate attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. Accordingly, we find it actually exercised as early as the annals of our law extend." [4 Black. Com. 286.]

And the law is as firmly settled in America as it is in England.

In Ex parte Robinson, 19 Wall. 505, the Supreme Court of the United States, speaking through Mr. Justice FIELD, said: "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power."

In Cartwright's case, 114 Mass. 238, GRAY, C. J.,

afterwards associate justice of the Supreme Court of the United States, said: ''The summary power to commit and punish for contempts tending to obstruct or degrade the administration of justice, is inherent in courts of chancery and other superior courts, as essential to the execution of their powers and to the maintenance of their authority, and is part of the law of the land, within the meaning of Magna Charta and of the twelfth article of our Declaration of Rights.''

In Watson v. Williams, 36 Miss. 341, HARRIS, J., said: ''The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and co-existing with them by the wise provisions of the common law. A court without the power to effectually protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against recusant persons before it, would be a disgrace to the legislation, and a stigma upon the age that invented it.''

In State v. Frew, 24 W. Va. 416, SNYDER, J., said: ''It may be stated as a proposition of law unquestioned and unquestionable, that by the common law of England as well as by the uniform decisions of the courts of this country, courts have the inherent power to punish for contempts, in a summary manner, and that this power is an essential element and part of the court itself which can not be taken away without impairing the usefulness of the court, because it is a power necessary to the exercise of all others.''

To the like effect are the decisions in the other States of the Union above referred to.

If each court did not possess the power to punish contempts committed against itself, the jury, and its officers, summarily, it would be easy for a contemnor to escape punishment entirely. For if the matter was sent

to another court or left to be tried by a jury, the contemnor could so insult and abuse such other court or the jury as to render it impossible for them also to try him, and by thus renewing his offense to every court he was called before, make it impossible to punish him at all. It is manifest that if the jury is insulted and treated with contempt, the court must protect them, for they can render no judgment and are powerless to protect themselves. It would be paradoxical to say the court alone can punish a contempt of the jury, but had no power to protect itself from contempt.

Without further exemplification, therefore, the law must be regarded as settled, that this court has the inherent power and jurisdiction to punish contempts summarily.

## III.

### WHAT CONTEMPTS MAY BE PUNISHED SUMMARILY.

The next proposition in this case is, what character of contempts this court has the inherent power to punish summarily.

Contempts are classified as civil or criminal, and as direct or constructive. Civil contempts are defined to be such as a private person is affected by, as for instance, where a party refuses to obey a judgment or order of court, which will benefit such private person. In such instance, the case is not punitive but executive, and the punishment is to commit the offender until he complies with the order. Criminal contempts are all acts committed against the majesty of the law or against the court as an agency of government, and in which, therefore, the State and the whole people are concerned. In such instance, the proceeding is punitive and the punishment operates *in terrorem,* and by that means has a tendency to prevent the repetition of the offense. [Rapalje on Contempts, sec. 21, adopting the definition of BEATTY, J., in Phillips v. Welch, 11 Nev. 187. See, also, 7 Am. and Eng. Enc. Law (2 Ed.), p. 28.]

Direct contempts are generally those which are committed in the presence of the court, while in session, or so near as to interrupt its proceedings, but also include any improper conduct tending to defeat or impair the administration of justice; while constructive contempts arise from matters not transpiring in court, and which tend to degrade or make impotent the authority of the court, or in some manner to impede or embarrass the administration of justice. The power to punish is the same in both cases. The difference is only one of procedure. In cases of direct contempts, the court acts spontaneously, *ex mero motu,* and commits the offender summarily. In cases of constructive contempts, the court, upon information furnished by any citizen, and verified by affidavit, or exhibited by the Attorney-General, ex-officio, which is supported by his official oath, and therefore needs no other verification, or upon its own information or motion, issues a citation to the offender to show cause why he should not be punished for contempt. [4 Black Com., 286-7; Odgers on Libel and Slander, p. 433-4; Paterson on Liberty of Press, etc., p. 99.]

Lord Chancellor HARDWICKE, in the case against the printer of the St. James Evening Post, 2 Atkyns' Rep. 1. c. 471, defines contempt of court as follows: "There are three different sorts of contempt. One kind of contempt is *scandalizing the court itself.* There may likewise be a contempt of this court, in abusing parties who are concerned in cases here. There may be also a contempt of this court, in prejudicing mankind against persons before the cause is heard. There can not be anything of greater consequence, than to keep the streams of justice clear and pure, that parties may proceed with safety both to themselves and their characters."

It will be observed that the first kind of contempt spoken of, to-wit, *scandalizing the court itself,* is a matter wherein the State, the people and the court are

vitally interested.   It is, therefore, a public matter, and hence is a criminal contempt.   The other two kinds of contempts spoken of, are such as directly affect a party litigant, and at the same time affect the public generally only in so far as it is of importance "to keep the streams of justice clear and pure."

Blackstone also makes the same distinction and defines contempts, *inter alia*, to consist in "speaking or writing contemptuously of the court or judges, acting in their official capacity."   [4 Black., Comm., p. 285.]

This distinction has been overlooked in some of the adjudicated cases, and hence the error they have fallen into of saying that the contempt must relate to a cause that is still pending, and if the cause is disposed of, that will be no contempt which would have been a contempt if it had occurred while the cause was pending.

The theory of such cases is that the act had a tendency to injuriously affect the rights of a party litigant in a pending litigation, or had a tendency to embarrass, although it might not actually influence, the court in the determination of a pending cause.

It must be obvious to the discriminating mind that such cases fall properly under the second or third classes pointed out by Lord HARDWICKE, supra, but that they do not cover the whole field, for there is still the first kind of a contempt, to-wit, scandalizing the court itself, in which the public is primarily interested, and as to which the injury is just as great whether it referred to a particular pending case, or only to the court as an instrumentality of government.

This is illustrated by the adjudicated cases.   In the case of In re Charlton, 2 Mylne & Craig 316, decided in 1836; in Macgill's case, 2 Fowl. Ex. Pr. 404; and in In re Wallace, L. R. 1 P. C. 283, s. c., 1 Privy App. 283, it was held to be a direct contempt of court to send libelous, scandalous or threatening letters to a court or a judge.

Charlton's case, supra, is one of the most cele-

brated of its kind.  Lord COTTENHAM, Lord Chancellor, said: "It is a contempt of the highest order; and although such a foolish attempt as this can not be supposed to have any effect, it is obvious that if such cases were not punished, the most serious consequence might follow.  If I consulted my own personal feelings upon the subject, I should pass by these letters as a foolish attempt at undue influence; but if I were to adopt that course, I should consider myself guilty of a very great dereliction of my high duty."  [Charlton's case, 2 Mylne & Craig l. c. 342.]

The limits of this opinion preclude any extensive review of the cases wherein attorneys, citizens and newspaper editors have been punished summarily, as for a criminal contempt for scandalizing the court or a judge.  The following are only a few of such cases: Wraynham was convicted of saying of Lord Bacon that he had done unjustly and was worse than a murderer. [2 St. Tr. 1071.]  For saying to Judge Hutton, "I accuse you of high treason," Harrison was fined five thousand pounds, and sent to prison, and in addition, the judge recovered ten thousand pounds damages. [Rex v. Harrison, 3 St. Tr. 1375.]  Lord George Gordon was convicted and punished for publishing a libel on the judges, in which he said: "How long shall these whited walls of counsel command us to be hanged contrary to law?  They make long charges to the juries with a show of justice, and religion.  They shed our innocent blood for expiable trespasses."

In Reg. v. Skipworth and De Castro, 12 Cox Crim. Cases 371, decided in 1873, De Castro had been the claimant of the Tichborne estates, had been nonsuited, and was committed for trial upon a charge of perjury. He and Skipworth held meetings in various parts of the country to excite sympathy for his cause and to collect funds for his defense.  At a meeting in Brighton, Skipworth presided, and in his speech, he im-

pugned the honesty and impartiality of Lord Chief Justice COCKBURN, the judge who was to preside at the trial of his friend De Castro for perjury. Some one hissed, and he replied, "Yes, sir, you may hiss, but I hiss at the Lord Chief Justice." De Castro also spoke, and charged the Lord Chief Justice with having denounced him as a rank impostor and therefore of being too prejudiced to try his case. They were cited for contempt, and each fined five hundred pounds, and sent to prison for three months.

In Rex v. Almon (Wilmot's Notes of Opinions and Judgts., p. 243; s. c., 8 St. Tr. 53), it was held to be a contempt of court and a libel, punishable by attachment, to publish a pamphlet asserting that judges have no power to issue an attachment for libels upon themselves, and denying that reflections upon individual judges are contempts of court at all.

In Ex parte Turner, 3 Mont. D. & De G. 523, a solicitor for the defeated party, after the case was over, published a pamphlet in which he pronounced the judgment, "an elaborate production, wholly beside the merits of the case," and employed other flippant and contumacious observations. He was held guilty of contempt.

Other cases which hold the same doctrine will be referred to hereinafter, in connection with the right of trial by jury in contempt cases, and the liberty of the press, because they also bear upon those questions.

These considerations result in holding that this court has jurisdiction to punish, summarily, civil as well as criminal contempts, and that this power is the same whether the contempt be direct or constructive, there being only a difference of procedure in the two cases.

The contempt in this case is both criminal and civil. It is criminal, because it scandalizes the court itself, and, therefore, it is a matter of public concern; and it is civil, because it abuses parties to a cause that

is still pending in this court, and because it seeks to prejudice mankind against parties to such pending litigation. It is also a libel upon a majority of the individuals composing this court, for which such individuals have a private right of action. Such judges, as individuals, may choose to treat the article with contempt, as Lord Chancellor Cottenham did in Charlton's case, 2 Mylne & Graig 342, and as the judges of the Colorado court did in Cooper v. People, 22 Pac. l. c. 800. But, because, as the Supreme Court of Colorado said in the Cooper case, supra, "They are the people's courts, and contemptuous conduct towards the judges in the discharge of their official duties, tending to defeat the due administration of justice, is more than an offense against the person of the judge—it is an offense against the people's court, the dignity of which the judge should protect, however willing he may be to forego the private injury;" and because, as Lord Chancellor Cottenham said in Charlton's case, supra, "It is obvious that if such cases were not punished, the most serious consequences might follow," and because if the contemnor was allowed to escape punishment, the people would have just cause to complain of the judges of this court for not enforcing proper respect for this instrument established by the people for the administration of justice, this court felt constrained to take notice of the contempt in this case.

The ill-disguised effort of the contemnor to make a political issue of the matter is not a proper subject for the court to deal with—the law-abiding, intelligent and patriotic people of this State will effectually settle that matter, if they are given an opportunity to deal with it.

## IV.

### POWER OF THE LEGISLATURE TO ABRIDGE THE INHERENT POWER OF THE COURT TO PUNISH CONTEMPT.

The defendant further invokes section 1616, Revised Statutes 1899, and claims that under this section this court has no power to punish this contempt, because it does not fall under any of the offenses which courts are authorized by that section to punish as contempts. The section relied on is as follows:

"Section 1616. *May Punish Contempts.*—Every court of record shall have power to punish as for a criminal contempt, persons guilty of the following acts, and no other: First, disorderly, contemptuous or insolent behavior, committed during its sitting, in immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority; second, any breach of the peace, noise or other disturbance, directly tending to interrupt its proceedings; third, willful disobedience of any process or order, lawfully issued or made by it; fourth, resistance willfully offered by any person to the lawful order or process of the court; fifth, the contumacious and unlawful refusal of any person to be sworn as a witness, or when so sworn, the like refusal to answer any legal or proper interrogatory."

If the Legislature had power to abridge or impair the power of this court to punish for contempt, then the defendant in this case could not be held liable. But if the Legislature had no such power, then the section of the statutes quoted is unconstitutional and not binding upon the court.

It has already been pointed out in paragraph II of this opinion, that the power of this court to punish contempts is inherent, and that statutes which attempt to confer such power have always been treated as conferring no new power, but as simply declaratory of the

common law power that already belonged to every court of record.

The law is well settled, both in England and America, that the Legislature has no power to take away, abridge, impair, limit, or regulate the power of courts of record to punish for contempts. [Rapalje on Contempts, sec. 11; 7 Am. and Eng. Ency. of Law (2 Ed.), p. 33; Arnold v. Commonwealth, 80 Ky. 300; Middlebrook v. State, 43 Conn. 257; State v. Morrill, 16 Ark. 384; People v. Wilson, 64 Ills. 195; Ex parte Robinson, 19 Wall. (U. S.) 505; Worland v. State, 82 Ind. 49; Cheadle v. State, 110 Ind. 301; Holman v. State, 105 Ind. 513; Matter of Shortridge, 99 Cal. 526; People v. Stapleton, 18 Colo. 568; In re Chadwick, 67 N. W. 1071; Hawes v. State, 46 Neb. 149; Hale v. State, 55 Ohio St. 210.]

In Wyatt v. People, 17 Colo. 261, the court said: "Though the Legislature can not take away from the courts created by the Constitution the power to punish contempts, reasonable regulations by that body touching the exercise of this power will be regarded." But this, it must be observed, leaves it to the courts to decide whether or not the regulations that may be prescribed are reasonable, and also proceeds upon lines of comity between the courts and the Legislature, and not upon any recognition of the absolute right of the Legislature to enact such regulations. In addition to this, it is now well-settled law in this, as well as in other States, that the courts have nothing to do with the policy or reasonableness of a law, those being legislative and not judicial questions. So that, if it be conceded that the Legislature had any power to regulate the exercise of the inherent power of the court to punish contempts, the court could not refuse to obey the law, because it deemed the regulations unreasonable. However, it is a contradiction of terms to say the power to punish is inherent, but that the Legislature may regulate the exercise. As the Supreme Court of the United

States said in Gibbons v. Ogden, 9 Wheat. 1, the power to "regulate" includes the power to say in what cases the right shall be exercised.

It is worthy of observation that in only the States of Georgia and Louisiana is power given, by the Constitution of the State, to the Legislature to limit the power of the court to punish for contempt. In all the other States the better opinion is that where the court is a creature of the Constitution, the inherent power to punish contempt can not be shorn, abridged, limited or regulated.

This is the only logical view to take, because by the Constitution (art. 3), the powers of government are distributed between the legislative, executive and judicial departments, and it is further expressly provided that, "No person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments, shall exercise any power properly belonging to either of the others, except in the instances in this Constitution expressly directed or permitted." And nowhere in the Constitution is the Legislature given any power to meddle with the inherent powers of the courts.

It was upon the faith of this provision of the Constitution that this court refused to interfere with the prerogatives of the Governor in the discharge of his duties, in the case of State ex rel. Robb v. Stone, 120 Mo. 428, and likewise refused to interfere with the inherent powers of the Legislature in State ex rel. v. Bolte, 151 Mo. 362.

In its dealings with the powers and acts of the co-ordinate branches of government, this court has scrupulously refrained from interfering, and has accorded to such co-ordinate branches the fullest measure of respect, and upon the same principle this court will not tolerate any interference by a co-ordinate branch of the government, or by any one else, with the powers and duties and prerogatives and dignity of this court. The

people of this State conferred those powers, in trust for themselves, upon this court, and this court will sacredly and fearlessly guard and protect them until the people discharge the trust and give the powers to some other tribunal, if they should ever be minded so to do.

It is also well-settled law that the court alone in which a contempt is committed, or whose authority is defied, has power to punish it or to entertain proceedings to that end. No other court has any jurisdiction or power in such cases. [Rapalje on Contempts, sec. 13; 7 Am. and Eng. Ency. Law (2 Ed.), p. 34, and cases cited in note 1, and from which it appears that this is the rule laid down by the United States courts, and by the courts of Alabama, California, Colorado, Florida, Illinois, Iowa, Kentucky, Louisiana, Mississippi, Nevada, New Hampshire, Tennessee, Texas, Utah and Vermont.]

Paterson on Liberty of the Press, etc., p. 121, says this power must be accorded to all courts, just as it is possessed by parliament.

The law now known as section 1616, Revised Statutes 1899, has been on the statute books, in substantially the same form, ever since 1845. [R. S. 1845, p. 338, sec. 61.] It was referred to by this court in Harrison v. State, 10 Mo. 688, but its constitutionality was not called in question, or discussed or decided.

The same law (then known as sec. 65, p. 542, R. S. 1855), was referred to by this court in, In the Matter of Greene County v. Rose, 38 Mo. 390, where it was said: "When the contempt is committed in the immediate view and presence of the court, it may be punished summarily; in all other cases, the party charged must be notified of the accusation, and have a reasonable time to make his defense." But the power of the Legislature to enact the law was not raised or decided.

The same law (then known as sec. 1055, R. S. 1879), was referred to in Ex parte Crenshaw, 80 Mo. l. c. 450, and the court was unanimous in holding that it did not

have the effect of taking away the power of courts to punish other kinds of contempts. The constitutionality of the law was not considered by the majority of the court, but SHERWOOD, J., concurred in the judgment, holding the statute "to be unconstitutional, as an invasion by the Legislature of the domain of the judiciary."

It follows that the Legislature exceeded its powers when it enacted section 1616, Revised Statutes 1899, and that this court has an inherent and constitutional right to punish contempt summarily, which can not be taken away, abridged, limited or regulated by the Legislature.

For the manner in which this power may be executed, this court is answerable alone to the sovereign people of this State, and to their judgment and wishes, legally expressed, it has always given cheerful and respectful obedience, and it stands ready to do so now and at all times.

## V.

### RIGHT OF TRIAL BY JURY IN CONTEMPT CASES.

The defendant invokes the protection of section 28 of article 2 of the Constitution, which provides that: "The right of trial by jury, as heretofore enjoyed, shall remain inviolate," and demands a trial by jury in this case, and incidentally argues that it is not seemly or fair that he should be tried for contempt by judges of the court that he has scandalized.

The judges of this court would have gladly sent this matter to some other court for trial, and by a jury, too, if such a course had any precedent or justification in law. But as such a course would have been illegal and a shirking of their imperative obligations under the law, they had no option but to deny the request, and to execute the law.

Attention has already been called to the law, as laid down by Judge Cooley in his work on Constitutional

Limitations (6 Ed.), p. 389, note 2, wherein he says: "Cases of contempt of court were never triable by jury; and the object of the power would be defeated in many cases if they were." Cases from England, Pennsylvania, Maine, New York, Tennessee, Illinois, Arkansas, Kentucky, North Carolina, Mississippi, New Hampshire, Connecticut, and Rhode Island, are cited by the learned author, in support of the rule.

Rapalje on Contempts, sec. 10, says: "It has been held that the provision in the Constitution of the United States that the trial of all crimes shall be by jury, does not take away the right of courts to punish contempts in a summary manner. The provision is to be construed to relate only to those crimes which, by our former laws and customs, had been tried by a jury."

The author cites in support of the text, the cases of Hollingsworth v. Duane, Wall. C. C. 77; Ex parte Grace, 12 Iowa 208, and State v. Doty, 3 Vroom 403.

In the case last cited, the Supreme Court of New Jersey held that the constitutional right of trial by jury was not infringed by the infliction of summary punishment for contempt of court. In that case, the contempt consisted of improper conduct towards a juror, not in the presence of the court.

Rapalje on Contempts, sec. 112, says: "In nearly all of the States, as well as under the practice of the Federal courts, the common-law rule denying to one accused of contempt the right of trial by jury is still in force, the courts holding that the various constitutional guaranties of this right have no application to these proceedings."

In 4 Enc. of Pl. and Pr., p. 789, the rule of law is thus aptly stated: "Although the question determinable in proceedings to redress contempts is one of fact and not of law, yet, the offense itself being one against the court and the majesty of the law, neither at common law was there any right to a jury trial (Wells v. Caldwell, 1 A. K. Marsh. [Ky.] 441; Eilenbecker v. District

Court, 134 U. S. 31), nor, according to the current weight of modern authority, except so far as the rule has been modified by local statutes'' [the author evidently means Constitutions, for the statutes could not confer a right of trial by jury which the Constitution did not permit] ''does any such right enure to the benefit of the contemnor.''    The author cites in support of the text, the following cases: Neel v. State, 9 Ark. 259; Huntington v. McMahon, 48 Conn. 174; Ex parte Grace, 12 Iowa 208; McDonnell v. Henderson, 74 Iowa 619; State ex rel. v. Durein, 46 Kans. 695; Hart v. Robinett, 5 Mo. 11; Gandy v. State, 13 Neb. 445; Ludden v. State, 31 Neb. 429; State v. Matthews, 37 N. H.  450; Bates's case, 55 N. H. 325; Burke v. Territory  (Okla. 1894), 37 Pac. 829; s. c., 2 Okla. 499; Crow v. State, 24 Tex. 12; King v. Railroad, 7 Biss. (U. S.) 529.

The author further adds, at the same page, ''And it is held that the fact that there is no right to a jury trial, does not violate the constitutional provisions which guarantee the same,'' citing in support thereof, State v. Mitchell, 3 S. Dak. 223; State v. Becht, 23 Minn. 411, and Manderscheid v. District Ct., 69 Iowa 240.

The case of Hart v. Robinett, 5 Mo. 11, cited, was a rule on a constable to show cause why he had not returned an execution within the time required by law. The trial court submitted the matter to the determination of a jury.    This court held that this was error, saying:  ''The cause was matter to be shown to the court, and not matter to be found by a jury.  The proceeding was in the nature of a proceeding for a contempt, and was a matter to be inquired into and adjudicated by the court.''

In Reg. v. Skipworth and De Castro, 12 Cox's Crim. Cases 371, already referred to, DeCastro demanded a trial by jury.  The following colloquy took place between him and BLACKBURN, J.  De Castro said:  ''I am not aware that I have committed any contempt, and if I have done so, it was not my intention; but I submit that

the charge ought to be tried by a jury; before them, I could prove what I have stated to be true." BLACK-BURN intimated that in a proceeding for contempt the matter was to be tried by the court. DeCastro: "Then, you decide that you are to try it yourselves?" BLACK-BURN, J.: "Such is the course." DeCastro: "But, you see, I am charged with contempt in complaining of the Lord Chief Justice, and you are his colleagues. It is not fair that you should try it without a jury." BLACKBURN, J.: "To use any argument upon that point would be without avail. It has long been settled that an attempt to interfere with the course of justice is a contempt of court. It is too late to dispute that." Accordingly, a jury trial was denied him.

In Respublica v. Oswald, 1 Dall. (U. S.) 319, the defendant as publisher of the Independent Gazetteer, published an address to the public concerning a proceeding, then pending in court, wherein he was a party, which tended to prejudice the public with reference to the merits of such pending litigation. He was cited for contempt. It was insisted that the Constitution of Pennsylvania guaranteed him a trial by jury, and hence the court could not itself try the case. The Supreme Court of the State, however, speaking through Mc-Kean, C. J., said: "It is certain that the proceeding by attachment is as old as the law itself, and no act of the legislature, or section of the Constitution, has interposed to alter or suspend it. Besides the sections which have been already read from the Constitution, there is another section which declares that 'trials by jury shall be as heretofore,' and surely it can not be contended that the offense, with which the defendant is now charged, was *heretofore* tried by that tribunal. If a man commits an outrage in the face of the court, what is there to be tried? What further evidence can be necessary to convict him of the offense, than the actual view of the judges? A man has been compelled to enter into

Vol 177 mo—16

security for his good behavior, for giving the lie in the presence of the judges in Westminster Hall.   On the present occasion, is not the proof, from the inspection of the paper, as full and satisfactory as any that can be offered?   And whether the publication amounts to a contempt, or not, is a point of law, which, after all, it is the province of the judges, and not of the jury, to determine.   Being a contempt, if it is not punished immediately, how shall the mischief be corrected?   Leave it to the customary forms of a trial by jury, and the cause may be continued long in suspense, while the party perseveres in his misconduct.   The injurious consequences might then be justly imputed to the court, for refusing to exercise their legal power in preventing them.   For these reasons, we have no doubt of the competency of our jurisdiction; and, we think, that justice and propriety call upon us to proceed by attachment.''   Accordingly, the defendant was denied a trial by jury, and was fined one hundred dollars and sent to prison for thirty days. This case will be again referred to in connection with the discussion of the liberty of the press.

The right of trial by jury in contempt cases never existed at common law, and was wholly unknown to the laws of Missouri at the time of the adoption of the Constitution of 1820, 1865, and 1875.   The guarantee of the Constitution of 1875, therefore, that, ''The right of trial by jury, as heretofore enjoyed, shall remain inviolate,'' was not intended to confer such a right in contempt cases, for such a right had never been ''heretofore enjoyed,'' either in this State or in England.

There is therefore no merit in the demand of the defendant in this case for a trial by jury.

But even if all this was not true, what is the attitude of the defendant in this case, and what issues of fact has he raised that a jury could pass on?

The return made by the defendant raises absolutely no issue of fact whatever.   It admits that the defendant is the publisher of the paper and that he published the

article.   A verdict of a jury could not settle those facts
any more conclusively than the defendant himself has
done by his admission.   The return does not dare to say
that the charges made are true.   Neither does it plead
any facts in mitigation.   What issue of fact is there then
for a jury to pass on?   Positively none.   The return
raises only questions of law, and if the case was one
wherein a jury could be impaneled, the court would be
compelled, under this state of the pleadings, to direct a
verdict, for after the court had decided the questions
of law, the case would be decided, and there would be no
function for the jury to perform.

These considerations are recorded here, not be-
cause there is a particle of doubt in the mind of the court
that the defendant is not entitled to a trial by jury, but
simply for the purpose of showing that even if the de-
fendant was entitled to such a trial, it would do him no
good in this case, and the result would necessarily be
the same.   It must be remembered that this is a case of
contempt and not one of libel.

In libel cases, the jury, under the direction of the
court, determines the law as well as the fact.   [Heller
v. Pulitzer Pub. Co., 153 Mo. 205.]   In contempt cases,
the whole matter is for the determination of the court.
[6 Am. and Eng. Ency. Law (2 Ed.), 978, and cases
cited in note 1.]

## VI.

### DUE PROCESS OF LAW.

The defendant also invokes the protection of sec-
tion 30 of article 2 of the Constitution, which provides
"that no person shall be deprived of life, liberty or
property without due process of law."

The defendant has been accorded the full benefit
of this wise provision of the organic law.   He has been
regularly charged, brought into court, has appeared in
person, and by counsel, has pleaded, and has had a trial

according to the practice in such cases. He has had his day in court, and, therefore, he has had the benefit of due process of law. [Cooley's Const. Lim. (6 Ed.), p. 431.]

This also disposes of the claim that the defendant has been deprived, in some way, of the benefit of the fourteenth amendment to the Constitution of the United States. [Dartmouth College v. Woodward, 4 Wheat. 519; Andrus v. Insurance Co., 168 Mo. l. c. 162.]

## VII.

### LIBERTY OF THE PRESS.

The defendant invokes section 14 of article 2 of the Constitution which is as follows: "That no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

It will be observed that the liberty of the press is not mentioned at all. The freedom of speech is guaranteed to "every person." Of course, the press will be included in the general designation of "every person." But the press has no greater liberty in this regard than any citizen. Newspapers and citizens have the same rights to tell the truth about any body or any institution. Neither has any right to scandalize any one or any institution. [Barnes v. Campbell, 59 N. H. 128; Pratt v. Pioneer Press Co., 30 Minn. 41; Mallory v. Pioneer Press Co., 34 Minn. 521; Bronson v. Bruce, 59 Mich. 467; McAllister v. Detroit Free Press, 76 Mich. 338; Negley v. Farrow, 60 Md. 158.]

The first amendment to the Constitution of the United States specifically mentions the liberty of the press. It is as follows: "Congress shall make no law

respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.''

It will be noted, however, that though the press is here specifically referred to, it is coupled with the freedom of speech of the citizen, and no special freedom is conferred upon the one that is not likewise conferred upon the other.

It is most important, therefore, to clearly understand what is meant by freedom of speech, or, as it is usually termed when speaking of newspapers, ''the liberty of the press.''

In 18 Am. and Eng. Ency. Law (2 Ed.), p. 1125, liberty of the press is thus defined: ''The liberty of the press consists in the right to publish, with impunity, the truth, with good motives and for justifiable ends, whether it respects governments or individuals; the right freely to publish whatever the citizen may please, and to be protected against any responsibility for so doing, except in so far as such publications, from their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals.''

Judge Cooley, in his invaluable work on Constitutional Limitations (6 Ed.), p. 518, says: ''The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, from their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals. Or, to state the same thing in somewhat different words, we understand liberty of speech and of the press

to imply not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards, we must look to the common-law rules which were in force when the constitutional guaranties were established, and in reference to which they have been adopted.''

Paterson on the Liberty of the Press, etc., p. 5, clearly explains the right as follows:

''The restraints which confine the natural liberty of speech will be found ranged under four great heads, of blasphemy, immorality, sedition, and defamation. There are bounds to be set to the expression of thoughts and opinions, and these must rest on the fundamental principles on which all societies are founded. It is assumed that there is a God in whom all citizens in their gravest moods are so interested, that it becomes offensive to all the rest if any one speaks of Him publicly in scurrilous and contemptuous tone, such as would provoke a breach of the peace. Hence, the first limit to free speech is blasphemy. There are also rules of morality, which are so universal, and so underlie the conscience of every individual, that speeches and writings which treat these rules with public contempt, and sap and mine the simple faith in all that is good, noble, and worthy, are also deemed a species of constructive breach of the peace too irritating to be allowed. Hence another limit to free speech and writing is immorality. Again, there are rules of good conduct founded on the general duty of all citizens to support the government under which they live, and if possible to insure due respect and fair treatment to its leading administrators. Hence, gross contempt of all laws and violent menaces of revolt against such guardians must not be allowed. For these necessarily discompose every citizen, and perplex him with fear of change or fear of public disaster and anarchy. And when

this last head is still further examined, it will appear that the great factors of government, consisting of the sovereign, the Parliament, the ministers of State, the courts of justice, must all be recognized as holding functions founded on sound principles, and to be defended and treated with an established and well-nigh unalterable respect. Each of these great institutions has peculiar virtues and peculiar weaknesses, but whether at any one time the virtue or the weakness predominates, there must be a certain standard of decorum reserved for all. Each guarded remonstrance, each fiery invective, each burst of indignation must rest on some basis of respect and deference towards the depository for the time being of every great constitutional function. Hence, another limit of free speech and writing is sedition. And yet within that limit, there is ample room and verge enough for the freest use of the tongue and pen in passing strictures on the judgment and conduct of every constituted authority.

"While the restrictions already mentioned, which are founded on blasphemy, immorality, and sedition, show the boundaries of free speech and thought as affecting the public generally, there is a fourth limit on the other side as affecting individuals, known under the head of libel, or the invasion of the reputation of private persons. This last limit involves the necessity of at once tracing the origin of that tendency of the individual to acquire such reputation and the value it possesses in his eyes, for it is here that the exercise of one natural right clashes directly with the exercise of the other, and both are equally natural and equally inevitable."

No better or clearer exposition of this subject has ever been written than what is said by McKEAN, C. J., of the Supreme Court of Pennsylvania, in Respublica v. Oswald, 1 Dall. (U. S.) 319. He said:

"Assertions and imputations of this kind are certainly calculated to defeat and discredit the administra-

tion of justice. . . And here, I must be allowed to observe, that libeling is a great crime, whatever sentiments may be entertained by those who live by it. With respect to the heart of the libeler, it is more dark and base than that of the assassin, or than he who commits a midnight arson. It is true that I may never discover the wretch who has burned my house or set fire to my barn; but these losses are easily repaired, and bring with them no portion of ignomy or reproach. But the attacks of the libeler admit not of this consolation; the injuries which are done to the character and reputation seldom can be cured, and the most innocent man may in a moment be deprived of his good name, upon which, perhaps, he depends for all the prosperity, and all the happiness of his life. To what tribunal can he then resort? How shall he be tried, and by whom shall he be acquitted? It is in vain to object, that those who know him will disregard the slander, since the wide circulation of the public prints must render it impracticable to apply the antidote as far as the poison has been extended. Nor can it be fairly said, that the same opportunity is given to *vindicate*, which has been employed to *defame* him; for, many will read the charge, who will never see the answer; and while the object of accusation is publicly pointed at, the malicious and malignant author rests in the dishonorable security of an anonymous signature. Where much has been said, something will be believed; and it is one of the many artifices of the libeler, to give to his charges an aspect of general support, by changing and multiplying the style and name of his performances. But shall such things be transacted with impunity in a free country, and among an enlightened people? Let every honest man make this appeal to his heart, and understanding, and the answer must be—No!

"What, then, is the meaning of the *Bill of Rights* and the *Constitution of Pennsylvania*, when they declare 'That the freedom of the press shall not be restrained,'

and 'that the printing presses shall be free to every person who undertakes to examine the proceedings of the Legislature, or any part of the government?'

"However ingenuity may torture the expressions, there can be little doubt of the just sense of these sections; they give to every citizen a right of investigating the conduct of those who are intrusted with the public business; and they effectually preclude any attempt to fetter the press by a *licenser*.

"The same principles were settled in England, so far back as the reign of *William the Third,* and since that time, we all know, there has been the freest animadversion upon the conduct of the ministers of that nation. But is there anything in the language of the Constitution (much less in its spirit and intention) which authorizes one man to impute crimes to another, for which the law has provided the mode of trial, and the degree of punishment? Can it be presumed that the slanderous words, which, when spoken to a few individuals, would expose the speaker to punishment, become sacred, by the authority of the Constitution, when delivered to the public through the more permanent and diffusive medium of the press? Or, will it be said, that the constitutional right to examine the proceedings of government, extends to warrant an anticipation of the acts of the Legislature, or the judgments of the court? And not only to authorize a candid commentary upon what has been done, but to permit every endeavor to bias and intimidate with respect to matters still in suspense? The futility of any attempt to establish a construction of this sort, must be obvious to every intelligent mind.

"The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame; to the

latter description, it is impossible that any good government should afford protection and impunity.

"If, then, the liberty of the press is regulated by any just principle, there can be little doubt, that he who attempts to raise a prejudice against his antagonist, in the minds of those that must ultimately determine the dispute between them, who, for that purpose, represents himself as a persecuted man, and asserts that his judges are influenced by passion and prejudice—willfully seeks to corrupt the source, and to dishonor the administration of justice."

This wholesome and vigorous code of morals and rule of conduct is just as necessary to-day as it was when it was established in the early history of these United States. It accords with the sense of right of all good and patriotic people, and those who live by slander must expect to suffer the just punishments which the law imposes for their crimes.

Among the ten commandments given by God to Moses was, "Thou shalt not bear false witness against thy neighbor." [Exodus, ch. 20, verse 16.] And when Christ went into Judea, teaching the people, one came unto him and said, "Good master, what good thing shall I do, that I may have eternal life? And He said unto him, Why callest thou me good? There is none good but one, that is God; but if thou wilt enter into life, keep the commandments. He saith unto him, Which? Jesus said, Thou shalt do no murder; Thou shalt not commit adultery; Thou shalt not steal; Thou shalt not bear false witness; Honour thy father and thy mother; and, Thou shalt love thy neighbor as thyself." [Matthew, chap. 19, verses 16, 17, 18 and 19.]

These obligations are just as binding to-day as they have always been since they were thus promulgated.

The laws of Moses also provided that if a man slandered his wife, the elders of the city should chastise him, and should amerce him in an hundred shekels of

silver, which should be given to the wife's father. [Deut., chap. 22, verses 13 to 19.]

"Coke says, libeling and calumniation is an offense against the law of God." [Paterson on Liberty of Press, etc., pp. 224-5.]

Good people obey the laws, slander no one, and speak the truth. Others must do so, or be punished. Upon no other basis could good government rest, or the rights of the people be protected. A court that failed to enforce these laws, would be so cowardly that it would be contemptible and a disgrace.

It is material to investigate the history of the adoption of the constitutional guaranty of free speech, and to understand the evils it was intended to suppress.

Cooley's Constitutional Lim. (6 Ed.), p. 513, says these constitutional provisions were not intended to confer any new rights, but simply to protect the citizen in those already possessed. It is then said: "At common law, however, it will be found that liberty of the press was neither well protected nor well defined. The art of printing, in the hands of private persons, has, until within a comparatively recent period, been regarded rather an instrument of mischief, than as a power for good, to be fostered and encouraged. Like a vicious beast, it might be made useful if properly harnessed and restrained. The government assumed to itself the right to determine what might or might not be published; and *censors* were appointed without whose permission it was criminal to publish a book or paper upon any subject."

The learned author then points out that the censorship continued until the revolution of 1688, and it was a criminal offense to publish the proceedings of Parliament, or of the courts, or even the current news of the day, without permission. He also shows that the same practice was followed in the American colonies until the Revolution, and that even after the Revolution, "the public bodies of the united nation did not at once invite

publicity to their deliberations. The constitutional convention of 1787 sat with closed doors, and although imperfect reports of the debates have since been published, the injunction of secrecy upon its members was never removed. The Senate for a time followed this example, and the first open debate was had in 1793.'' The same author, at p. 516, then adds: ''It must be evident from these historical facts that liberty of the press, as now understood and enjoyed, is of very recent origin; and commentators seem to be agreed in the opinion that the term itself means only that liberty of publication without the previous permission of the government, which was obtained by the abolition of the censorship. In a strict sense, Mr. Hallam says, it consists merely in exemption from a licenser. A similar view is expressed by De Lolme. 'Liberty of the press,' he says, 'consists in this: that neither courts of justice, nor any other judges whatever, are authorized to take notice of writings *intended* for the press, but are confined to those which are actually printed.' Blackstone also adopts the same opinion, and it has been followed by American commentators of standard authority'' [he refers to Story on Const., sec. 1889; 2 Kent. 17 et seq., and Rawle on Const., c. 10] ''as embodying correctly the idea incorporated in the constitutional law of the country by the provisions of the American Bill of Rights.

''It is conceded on all sides that the common-law rules that subject the libeler to responsibility for the private injury, or the public scandal or disorder occasioned by his conduct, are not abolished by the protection extended to the press in our Constitution. The words of Ch. J. PARKER, of Massachusetts, on this subject, have been frequently quoted, generally recognized as sound in principle, and accepted as authority. 'Nor does our Constitution or declaration of rights' he says, speaking of his own State, 'abrogate the common law in this respect, as some have insisted. The sixteenth article declares that ''liberty of the press is essential

to the security of freedom in a State; it ought not therefore to be restrained in this commonwealth.'' The *liberty* of the press, not its *licentiousness;* this is the construction which a just regard to the other parts of that instrument, and to the wisdom of those who founded it, requires. .In the eleventh article it is declared that ''every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character;'' ' and thus the general declaration in the sixteenth article is qualified. Besides, it is well understood and received as a commentary on this provision for the liberty of the press, that it was intended to prevent all such *previous restraints* upon publications as had been practiced by other governments, and in early times here, to stifle the efforts of patriots towards enlightening their fellow-subjects upon their rights and the duties of the rulers. The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep firearms, which does not protect him who uses them for annoyance or destruction.''

This is the true rule. The liberty of the press means that any one can publish anything he pleases, but he is liable for the abuse of this liberty. If he does this by scandalizing the courts of his country, he is liable to be punished for contempt. If he slanders his fellowmen he is liable to a criminal prosecution for libel, and to respond, civilly, in damages for the injury he does to the individual. In other words, the abuse of the privilege consists, principally, in not telling the truth.

It is no new claim that newspapers have a greater privilege than the ordinary citizen. This is a grave error.

In King v. Root, 4 Wend. 113, Chancellor WAL-WORTH said: ''It has been urged upon you that conductors of the public press are entitled to peculiar indulgencies and have special rights and privileges. The

law recognizes no such peculiar rights, privileges, or claims to indulgence. They have no rights, but such as are common to all. They have just the same rights that the rest of the community have, and no more. They have the right to publish the truth, but no right to publish falsehood to the injury of others with impunity."

And in Hotchkiss v. Oliphant, 2 Hill 510, Chief Justice NELSON, speaking for the Supreme Court of New York, said:

"It is made a point in this case, and was insisted upon in argument, that the editor of a public newspaper is at liberty to copy an item of news from another paper, giving at the same time his authority, without subjecting himself to legal responsibility, however libelous the article may be, unless express malice be shown. It was conceded that the law did not, and ought not, to extend a similar indulgence to any other class of citizens; but counsel said a distinction should be made in favor of editors, on the ground of the peculiarity of their occupation. That their business was to disseminate useful knowledge among the people; to publish such matters relating to the current events of the day happening at home or abroad as fell within the sphere of their observation, and as the public curiosity or taste demanded; and that it was impracticable for them at all times to ascertain the truth or falsehood of the various statements contained in other journals. We are also told that if the law were not thus indulgent, some legislative relief might become necessary for the protection of this class of citizens. *Undoubtedly if it be desirable to pamper a depraved public appetite or taste,* if there be any such, by the republication of all the falsehoods and calumnies upon private character that may find their way into the press, to give encouragement to the widest possible circulation of these vile and defamatory publications, by protecting the retailers of them, some legislative interference will be necessary; for no countenance can be found for the irresponsibility claimed in the

common law.   That reprobates the libeler, whether author or publisher, and subjects him to both civil and criminal responsibility.   His offense is there ranked with that of the receiver of stolen goods, the perjurer and suborner of perjury, the disturber of the peace, the conspirator, and other offenders of like character.   .   . The act of publication is an adoption of the original calumny, which must be defended in the same way as if invented by the defendant.   The republication assumes and indorses the truth of the charge, and when called on by the aggrieved party, the publisher should be held strictly to the proof.   If he chooses to become the indorser and retailer of private scandal, without taking the trouble of inquiring into the truth of what he publishes, there is no ground for complaint, if the law, which is as studious to protect the character as the property of the citizen, holds him to this responsibility.   The rule is not only just and wise in itself, but if steadily and inflexibly adhered to and applied by courts and juries, will greatly tend to the promotion of truth, good morals and common decency on the part of the press, by inculcating caution and inquiry into the truth of charges against private character before they are published and circulated throughout the community.''

Time was when if any citizen or newspaper insulted or slandered or maligned a citizen, the injured party demanded satisfaction according to the Code of Honor, and if this was refused, treated the offender as a mad dog is usually dealt with.   It is worthy of notice that in those days every one was careful to tell the truth about his fellowmen, and equally careful to avoid scandalizing them.   But even in those days there were occasional breaches of decency in this regard, which were promptly dealt with.   A sentiment, however, grew up that such a method settled nothing—that the innocent party was as liable to be removed or hurt as the guilty, and that the result did not show which told the truth.   Thus public sentiment discouraged, if it did not forbid, such a

method of settling such grievances, and it was insisted that the remedies afforded by the laws were ample to properly handle all such matters, and hence that any one aggrieved must not take the law in his own hands but must let the courts settle it. So the old method has become nearly obsolete, but even now, it is occasionally resorted to when the offense is peculiarly aggravated and so indecent that it is impossible for human nature to stand it.

Now it is gravely argued by libelers that the liberty of the press includes a right to scandalize courts, to libel and slander and utter the most flagrant and indecent calumnies about public officers and even private citizens, and to invade the sanctuaries of the churches, the temples of justice, or the sacredness of the home and the private family, and without any good motive or for any public purpose, to publish the most cruel, false and scandalous articles concerning them. And there are newspapers that have so far misconceived their proper functions or been misguided by other considerations, as to indulge in such practices. And there is always a class of moral perverts and degenerates, in every community, who feed their morbid appetite upon such scandals, and rejoice at the injury thus done to those who are so infinitely their superiors that they are not worthy to fasten the latchets of their shoes. But to the credit of the newspaper profession, it is due to here make a record of the fact, that the great majority of the members of that profession do not approve or sanction such practices, or such "yellow" journalism, but have a proper appreciation of the rights, and purposes, and functions of a newspaper, and deplore the fact that such unworthy persons are engaged in the profession, as much as lawyers deplore the black sheep that will sometimes creep into the fold. The contrast between the two classes, marks the difference between respectability and indecency, between intelligence and ignorance, between

the law-abiding, patriotic citizen and the Ishmaelite—the assassin of character for the accumulation of lucre.

The great body of the people condemn such practices and such miscreants, and the courts would deserve condemnation and abolition, if they did not vigorously and fearlessly punish such offenders. Such practices are an abuse of the liberty of the press, and if the slander relates to the courts, it concerns the whole public and is therefore punishable summarily as a criminal contempt, and if it concerns an individual, it is punishable civilly and criminally as for a libel.

There is no species of property, and no class of people, that need the protection of the law as much as newspapers and editors, and they would feel the loss of such protection more speedily and more acutely than any one else. Self-interest should, therefore, induce them not to impair the power or authority of the courts, and not to inculcate a feeling of disrespect or want of confidence in the courts.

Curran called the liberty of the press a *"sacred palladium."* But without the shield and bulwark of the law and the courts, even the Goddess Pallas would be unable to protect the press, or to preserve the rights and safety and peace of the people. Without the law and the courts, chaos and anarchy would prevail. There would be no protection for life, liberty, property or character. He, therefore, who seeks to destroy the authority of the courts, invites anarchy, and sows seed for his own undoing.

It is the *liberty* of the press that is guaranteed—not the *licentiousness.* It is the right to speak the truth—not the right to bear false witness against your neighbor. Every citizen has a constitutional right to the enjoyment of his character as well as to the ownership of his property; and this right is as sacred as the liberty of the press. In King v. Burdett, 4 Barn. & Ald. 95, it was said: "The liberty of the press can not impute

Vol 177 mo—17

criminal conduct to others, without violating the right of the character, and that right can only be attacked in a court of justice, where the party attacked has a fair opportunity of defending himself. *Where vituperation begins, the liberty of the press ends*" [the italics are added].

It must be clearly understood and always borne in mind that there is a vast difference between criticism or fair comment on the one side, and defamation on the other. Odgers on Libel and Slander, page 35, says: "Every one of the public is entitled to pass an opinion on everything which in anyway invites public attention. Those of the public whose opinion on such matters is best worth having are called critics. From their character, ability, or experience, they can judge with precision (which is the true meaning of the word *criticize*) and their opinion, therefore, is entitled to respect. Their criticism may be commendatory, but it is, perhaps, more generally unfavorable. Still, so long as it continues to be criticism at all, it is not defamatory. Where defamation commences, true criticism ends.

"True criticism differs from defamation in the following particulars:

"I. Criticism deals only with such things as invite public attention or call for public comment.

"II. Criticism never attacks the individual, but only his *work*. Such work may be either the policy of a government, the action of a member of Parliament, a public entertainment, a book published, or a picture exhibited. In every case, the attack is on a man's *acts*, or on some *thing*, and not upon the man himself. A true critic never indulges in personalties.

"III. True criticism never imputes or insinuates dishonorable motives (unless justice absolutely requires it, and then only on the clearest proofs).

"IV. The critic never takes advantage of the occasion to gratify private malice, or to attain any other object beyond the fair discussion of matters of public

interest, and the judicious guidance of the public taste."

The same author quotes with approval the language of HUDDLESTON, B., in Whistler v. Ruskin, where he says: "A critic must confine himself to criticism, and not make it the veil for personal censure, nor allow himself to run into reckless and unfair attacks merely for the love of exercising his power of denunciation."

And the author adds, p. 38: "But all comments must be fair and honest; matters of public interest must be discussed temperately. *Wicked and corrupt motives should never be wantonly assigned*" [the italics are added]. "And it will be no defense that the writer, at the time he wrote, honestly believed in the truth of the charges he was making, if such charges be made recklessly, unreasonably and without any foundation in fact. Some people are very credulous, especially in politics; and can readily believe any evil of their opponents. There must therefore be some foundation in fact for the charges made; the writer must bring to his task some degree of moderation and judgment."

The author also quotes with approval the language of COCKBURN, C. J., in Campbell v. Spottiswoode, 32 L. J. Q. B. 199: "A line must be drawn between criticism upon public conduct and the imputation of motives by which that conduct may be supposed to be actuated; one man has no right to impute to another, whose conduct may be fairly open to ridicule or disapprobation, base, sordid, and wicked motives, unless there is so much ground for the imputation that a jury shall find, not only that he had an honest belief in the truth of his statements, but that his belief was not without foundation."

Paterson on Liberty of Press, etc., p. 131, says: "While, therefore, it is lawful for any one to publish a report of a proceeding in a court of justice, still this must be a fair and authentic report of what happened. If the report is mixed up with comments showing an *animus* against a party, and giving an unfair impres-

sion, the publisher then ceases to have the benefit of this absolute right of publication"—the author is discussing the liberty of the press.

The courts of other States have held that it is libelous to charge an officer with having taken a bribe, or with corruption or want of integrity. In such cases, the publisher must stand ready to prove the truth of his charges, or he will not go unwhipped of justice. [Hamilton v. Eno, 81 N. Y. 116; Wilson v. Noonan, 35 Wis. 321; Gove v. Blethen, 21 Minn. 80; Russell v. Anthony, 21 Kans. 450; Littlejohn v. Greeley, 13 Abb. Pr. 41; Dole v. Van Rennselaer, 1 John. Cas. 330; Negley v. Farrow, 60 Md. 158; Neeb v. Hope, 111 Pa. St. 145.]

It is pertinent and profitable to set out a few of the cases wherein the courts of other jurisdictions have summarily punished persons as for a criminal contempt, on account of publications which were calculated to bring public odium upon the court.

The case of Respublica v. Oswald, 1 Dall. U. S. 319, has already been referred to.

In Respublica v. Passmore, 3 Yeates 441, the defendant was fined fifty dollars and sent to jail for thirty days, for publishing an article reflecting upon one of the parties to a pending cause, which tended to interfere with the course of justice.

In People v. Freer, 1 Caines 518, the defendant published, in the Ulster Gazette, certain comments concerning a trial that had occurred in court, that were calculated to prejudice and influence the public mind against the court, and to intimidate and influence the court in deciding a motion for a new trial that was then pending. He was punished for contempt. The court said: "Publications scandalizing the court, or intending unduly to influence, or overawe their deliberations, are attempts which they are authorized to punish by attachment; and, indeed, it is essential to their dignity of character, their utility and independence, that they should possess and exercise this authority."

In Tenney's case, 23 N. H. 162, the defendant, who had no interest in a pending action, except that his son had sued one of the defendants and had lost, caused copies of the petition in the pending action, which contained serious charges against the defendants, to be published and circulated among persons with whom the defendants had business relations, in which he said he could stop the suit if the defendants would pay him one thousand dollars—that being the amount he said he had lost by his son's unsuccessful suit against the defendants. It was held that "such conduct tended to obstruct the free course of justice, and was a contempt of court," and a rule in attachment was granted.

For publishing an account of a trial for treason, when the court had forbidden any publication of it, because like cases were pending against other persons, whose rights might be affected, the defendant, as editor of the Observer, was fined five hundred pounds by the court of King's Bench in England, in 1821. [King v. Clement, 4 Barn. & Ald. 218.]

In Sturoc's case, 48 N. H. 428, the defendant, a member of the bar, was punished as for a criminal contempt, for publishing a communication in a newspaper, respecting a prosecution under the liquor laws of that State, which tended to prejudice the minds of the people against the case.

In State v. Morrill, 16 Ark. 384, the defendant as editor of the Des Arc Citizen, published an article in which, by implication, he charged the judges of the Supreme Court of Arkansas with having been *bribed* to render a certain decision in a habeas corpus case, that had been finally decided by that court. Upon the publication being called to the attention of the court, by a communication addressed to one of the judges of the court, by a member of the bar, the court issued a rule to show cause. The defendant pleaded the statute of that State prescribing that in certain instances, and no others, the court could punish for contempt. It was

admitted that the act complained of did not fall within the terms of the statute, and it was claimed that the court had no power to punish for any other kind of a contempt than that specified in the statute. The statute was, *in ipsissimis verbis,* exactly like section 1616, Revised Statutes Missouri 1899.

It will be observed that the charge was practically the same in that case as in the case at bar, and that the statute relied on in that case is exactly like our statute. The court held the statute to be beyond the power of the Legislature to enact, and that the power to punish, as for a criminal contempt, was inherent in the court.

The court also held, as stated in the headnote, that: "Any citizen has a right to comment upon the proceedings and decisions of this court, to discuss their correctness, and the fitness or unfitness of the judges for their stations, and the fidelity with which they perform the important trusts reposed in them; but he has no right, under the seventh section of the Bill of Rights, to attempt, by libelous publications, to degrade the tribunal, etc.—such publications are an abuse of the liberty of the press, for which he is responsible."

It was also objected that it was not a contempt of court, because it did not relate to a case then pending, and therefore the rights of no party litigant were affected by it. But the court referred to the adjudications, particularly Commonwealth v. Dandridge, 2 Va. Cases 408, presently to be cited, and said: "The cases above cited (and many more might be cited if deemed at all necessary) abundantly show that, by the common law, courts possessed the power to punish, as for contempt, libelous publications, of the character of the one under consideration, upon their proceedings *pending* or *past,* upon the ground that they tended to degrade the tribunals; destroy that public confidence and respect for their judgments and decrees, so essentially necessary to the good order and well-being of society, and most effectually obstructed the free course of justice."

Accordingly, the defendant was punished, summarily, as for a criminal contempt.

In Commonwealth v. Dandridge, 2 Va. Cases 408, the court, at a prior term, had decided a case against the defendant. He met the judge at the door of the courthouse, before the opening of court for the next term, and grossly insulted him, charging him with corruption and cowardice in the decision of his case. He was cited for contempt, and it was objected that the act did not relate to a pending cause. The case was transferred to the general court of the State, and that court, speaking to this point, said: "Upon this part of the subject, and in reference to cases which have an indirect bearing on the present question, a distinction is attempted, for which I can find neither reason nor authority. It is said, that the attaching power may be exercised for contempts touching the *prospective* conduct of the judge, but not for such as touch his *past* conduct. In reason, I see but one pretense for this distinction: threats and menaces of insult, or injury to a judge, in case he shall render a certain judgment, may be considered as impairing his independence and impartiality in the particular case to which the threats refer. And if the power of punishment stop here, a curious consequence may ensue. A man may be attached for threatening to do that for which he could not be attached when actually done. One says of a judge, 'If he render a certain judgment against me, I will insult or beat him.' For this he may be attached. But if (the judgment having been rendered) the insult be actually offered, an attachment no longer lies; because the contempt is in relation to the past conduct of the judge, and to a case no longer pending. A recurrence to original principles, the only true test, by demonstrating that the weight, authority, and independence of the court may be equally assailed either way, will prove that this distinction is merely ideal."

In the case of In re Pryor, 18 Kans. 72, the court

finally decided a case, and the attorney for the losing party wrote a letter to the judge, saying the decision "is directly contrary to every principle of law governing injunctions, and everybody knows it, I believe. . . . It is my desire that no such decisions or orders shall stand unreversed in any court I practice in." The court held that it was a criminal contempt, fined him fifty dollars and suspended him from practice until the fine was paid, and the Supreme Court affirmed the judgment.

In the case of In re Woolley, 11 Bush (Ky.) 95, the defendant, as attorney for the losing party, filed a motion for rehearing in which, in a supercilious and dogmatic style, he charged "that the court had overlooked the facts of the case; that it had assumed facts having no place in the proof, and ignored others which stood out on every page of the record; that it was careless and indifferent to the rights of a litigant, and that the result of this carelessness and indifference was a ruinous, disastrous and unjust judgment against a party wholly innocent of all offense." The court pronounced the offense to be "of a nature too grave to be silently overlooked." The defendant was cited for contempt and disclaimed, under oath, any intention to commit a contempt, and in consideration of this condition, his fine was assessed at the nominal sum of thirty dollars.

In People v. Wilson, 64 Ills. 195, the defendant, the editor of the Chicago Evening Journal, published, in 1872, an article with reference to a case then pending in the Supreme Court, in which he reflected on the action of the court in that case, impeached its integrity, and sought to intimidate the action of the court by threat of popular clamor. He was cited for criminal contempt and fined one hundred dollars.

In this case, the Court adopted the rule laid down by Bishop's Criminal Law, sec. 216, wherein it is said: "According to the general doctrine, any publication,

whether by parties or strangers, which concerns a case pending in court, and has a tendency to prejudice the public concerning its merits, and to corrupt the administration of justice, or which reflects on the tribunal or its proceedings, or on the parties, the jurors, the witnesses or the counsel, may be visited as a contempt.''

In the case of In re Chadwick, 67 N. W. (Mich.) 1071, the defendant, as attorney for the losing party, in a case that had been decided by the Supreme Court of Michigan, wrote and published in 1896, an article in the Port Huron News, criticising the decree, and in it charged the judge with unfairness and improper conduct. The Supreme Court of Michigan held it to be a contempt of court, and that the power to punish for contempt existed as well after a case was finally disposed of as where it was still pending. The attachment was issued in this case upon a petition of the members of the bar, informing the court of the contempt.

In Fishback v. State, 30 N. E. (Ind.) 1088, the defendant, as editor of the Terre Haute Express, published, in 1892, a certain article reflecting upon the grand jury, the judge of the circuit court, the prosecuting attorney, and the city engineer, and casting doubt upon their integrity and honesty, with respect to the investigation and punishment of certain street improvement contractors. The defendant denied any intention to commit a contempt. It was held that where a matter was libelous *per se,* the denial of the defendant that he intended to commit a contempt would not avail him, but if the article was not *per se* libelous, but could be made so only by innuendo, the defendant would be discharged upon showing that he intended no contempt.

In People ex rel. Connor v. Stapleton, 33 Pac. (Colo.) 167, William Stapleton and Kemp G. Cooper, editors of the Denver Republican, were cited for contempt in publishing in 1893, an article in the paper, ''implying that the Supreme Court has been induced, by improper influences, to delay rendering a decision,''

in a certain cause. The court said of the article: "It is not merely a private wrong against the rights of litigants, and against the judges. It is a public wrong, a crime against the State, to undertake, by libel or slander, to impair confidence in the administration of justice. That a party does not succeed in such undertaking lessens his offense only in degree." The court also held that the power of the court to punish for contempt was not limited by the provision of the code which attempted to define the cases in which the court could punish for contempt; and also held that the liberty of the press was not in any way impaired by the court punishing as for a contempt, the abuse of such liberty.

In Cooper v. People ex rel., 22 Pac. (Colo.) 790, the defendant as editor of the Denver Republican, published, in 1889, an article reflecting upon the manner in which a certain pending case was being tried by the court. He was cited for contempt. He also demanded a trial by jury and pleaded the liberty of the press. A jury trial was denied him. And touching his other plea, the court said: "We would not for a moment sanction any contraction of the freedom of the press. Universal experience has shown that such freedom is necessary to the perpetuation of our system of government in its integrity; but this freedom does not license unrestrained scandal. By a subsequent clause of the same sentence of our State Constitution in which the liberty of the press is guaranteed, the responsibility for its abuse is fixed. With us the judiciary is elective, and every citizen may fully and freely discuss the fitness or unfitness of all candidates for the positions to which they aspire; criticise freely all decisions rendered, and by legitimate argument, establish their soundness or unsoundness; comment on the fidelity or infidelity with which judicial officers discharge their duties—but the right to attempt, by wanton defamation, to prejudice the rights of litigants in a pending cause, degrade the tribunal, and impede, embarrass, or corrupt that due

administration of justice which is so essential to good government, can not be sanctioned." [Id., l. c. 799.]

Burke v. Territory of Oklahoma, 2 Okla. 499, was an attachment for contempt against the defendant, for publishing, in 1894, in the Oklahoma Times-Journal, an article respecting a report of the grand jury, where the question was whether it should be received by the court or returned to the grand jury, and in which article it was said that the judge's actions indicated that he intended to withhold the report, and adding that if the judge persisted in carrying out such intention, it might be characterized as a flagrant violation of the people's rights, and that the action of the court "is an effort to browbeat the grand jury, an effort to bend the grand jury to the will of the court, and a serious matter."

It was held to be a criminal contempt, and the punishment fixed at a fine of $250, and imprisonment for ten days.

It was also held that the Legislature had no power to limit or regulate the inherent power of a court to punish contempts, and that in contempt cases the defendant was not entitled to a trial by jury.

In Little v. State, 90 Ind. 338, decided in 1883, it was held that the power of the courts to punish for contempt is inherent, and can not be prevented or abridged by legislative action; and that an attempt to create the belief that a juror or officer of court can be bribed, is a contempt of court. [See, also, Hawkins v. State, 125 Ind. 570.]

Other instances where public officers have resorted to a private action of libel, to remedy the wrong, can be found in the following cases: Neeb v. Hope, 111 Pa. St. 145; Negley v. Farrow, 60 Md. 158; Dole v. Van Rennselaer, 1 John. Cas. 330; Littlejohn v. Greeley, 13 Abb. Pr. 41; Russell v. Anthony, 21 Kans. 450; Gove v. Blethen, 21 Minn. 80; Wilson v. Noonan, 35 Wis. 321; Hamilton v. Eno, 81 N. Y. 116.

Thus at great pains and tedious length, the cases

bearing upon the matters involved in this case, have been collected and digested, with the purpose and to the end that the people may know the grounds upon which the judgment in this case rests, and so that all others may know the law, and avoid being guilty of like offenses, or else offend knowingly, and hence invite inevitable punishment.

There was nothing in the case to which the article in this case referred, to call for any such scandalizing of the court. The case arose prior to the fellow-servant law. It was a case wherein a brakeman was injured by a wreck of the train on which he was working. He based his right to recover upon the ground that the master had failed to furnish safe appliances with which to do the work, in consequence of which the injury was received. The unsafe appliance was alleged to be a freight car that had unsafe sills, which were so rotten that the car broke down from its own infirmity, while still on the track. The defense was that the wreck was caused by the fore wheels of the alleged unsafe car, jumping the track, and that the car was whole when it left the track, and broke afterwards, and hence that the injury was caused by a risk which the plaintiff assumed when he entered the master's service, and not by any negligence of the master in furnishing the servant unsafe appliances. A majority of the court was of the opinion that there was absolutely no evidence whatever to support the plaintiff's case, while the minority of the court was of opinion that there was such evidence, or at least enough thereof to take the case to the jury. No one believed or dared to charge another with dishonesty of opinion or action, and there was no foundation in fact and in truth for any such charge.

There was, therefore, no legal justification or excuse for the article that was published by the defendant. He did not dare attempt to prove or claim that it was true, but stood mute as to that, and sought to escape punishment on other grounds, which were untenable.

He was therefore guilty of malice. He abused the liberty of the press and made himself liable therefor. Let the honest, fair-minded, patriotic people of this State say whether or not it was not the duty of the court to punish him.

The courts of this State have been conservative in the extreme, and forbearing to a fault. They have overlooked remarks concerning their acts from lawyers and laymen, that were improper and outside of the pale of the law, preferring, if possible, to attribute the offense to the zeal of counsel or the excitement of the laymen, incident to disappointment of personal hopes and ambitions. They have been considerate of the feelings and character of others, and have, many times, abstained from the use of strong language, under trying provocation, in deciding cases. And it was proper to do so. But the protection and safety of life, liberty, property and character, the peace of society, the proper administration of justice, and even the perpetuity of our institutions and form of government, imperatively demand that every one, lawyer, layman, citizen, stranger, newspaper man, friend or foe, shall treat the courts with proper respect, shall not attempt to degrade them, or impair the respect of the people, or destroy the faith of the people, in them. When the temples of justice become polluted or are not kept pure and clean, the foundations of free government are undermined and the institution itself threatened. The people have no fear of their courts abusing their power to punish for contempt or in any other respect.

Alexander Hamilton, in advocating the adoption of the provisions of the Federal Constitution relating to the judiciary, said: "Whoever attentively considers the different departments of power, must perceive that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity

to annoy or injure them. The executive not only dispenses the honors, but holds the sword of the community. The Legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or the wealth of society; and can take no active resolution whatever. It may be truly said to have neither *force* nor *will*, but merely judgment; and must ultimately depend upon the aid of the executive arm for the efficacious exercise even of this faculty.'' [Federalist, p. 355:] This view is indorsed by Judge STORY in his treatise on the Constitution, vol. 2 (4 Ed.), p. 401.

It may well be said that courts depend for their existence, usefulness and efficacy upon the consent of the people. They must depend, first, upon the loyalty, the intelligence and the counsel of the bar to the people; second, upon the faithful communication by the high-minded, intelligent and truthful members of the newspaper profession to the reading public, of their acts and conduct and judgments; and third, upon the wisdom, the honesty and the patriotism and sense of justice and fair play, of the great body of the people, who have established these institutions, clothed them with dignity and power, elected the judges to serve them as their judicial agents, and who have never failed, in the long run, to distinguish between right and wrong, between the true and the false, between the faithful and the faithless servants, and who have no patience with slanders, or those who live by or feed upon slanders.

To be a judge over such people is the highest honor that can be conferred upon mortal man. To be a judge without such powers as a judge, were to be a kicking-post for every madman, a butt for every idiot or knave, and withal, an object of contempt of all men.

Unfortunately, there must always be a losing as well as a winning party to every suit, and courts must

needs inflict pain as well as impart joy by every judg-
ment rendered. But the loser to-day may be the winner
in another case to-morrow. And so if every loser was
privileged to go to the tavern and "cuss the court" to-
day, he would necessarily have to retract his reproaches
and praise the court to-morrow when he is a winner.

So it is in life. It is nearly always true that one
man's loss is another man's gain. But life is not a
failure, and business is not a fraud and to be con-
demned, for such reasons.

"Do unto others as ye would others should do unto
you;" do not bear false witness against your neighbor;
keep the commandments; obey the laws; tell the truth;
be honest to yourself as well as to your fellow-man;
bear no malice, but judge all men with charity, and life
will be sweeter and more profitable, and the world will
be better, and your neighbor's faults will not appear
quite so unpardonable.

In this spirit, the judgment in this case was entered,
and in this spirit, let it be judged.

What is herein said in no matter whatever conflicts
with what was said in Marx & Haas Jeans Clothing Com-
pany v. Watson, 168 Mo. 133. That was a suit in equity
to enjoin a boycott, and it was held that injunction would
not lie to restrain the utterance of a libel or slander or
to restrain free speech. It was held there, as it is here,
that every one may speak, write or publish what he will,
but is responsible for the abuse of the privilege. [Id.,
l. c. 150.] That case, as well as this, holds that the
courts can not *prevent* a man telling an untruth about
another, but their power is limited to punishing him if
he does so.

For these reasons, the defendant in this case was
adjudged guilty of contempt. *Robinson, C. J., Brace,
Gantt, Burgess, Valliant* and *Fox, JJ.,* concur.